[No. 21680.   Department Two.   August 27, 1929.]

WILLIAM L. DUGGINS, *Respondent*, v. INTERNATIONAL
MOTOR TRANSIT COMPANY *et al., Appellants.*[1]

[1]Reported in 280 Pac. 50.

*Poe, Falknor, Falknor & Emory,* for appellants.

*C. D. Cunningham, Dysart & Ellsbury,* and *Lloyd B. Dysart,* for respondent.

MILLARD, J.—In this action, which was instituted by a passenger to recover from a stage company and its statutory surety for personal injuries sustained in the overturning of a stage, the verdict was in favor of the plaintiff. From the judgment entered, motions for judgment notwithstanding the verdict and for a new trial having been overruled, the defendants appealed.

On February 2, 1928, a stage of the International Motor Transit Company, on which respondent was a passenger, was proceeding in a southerly direction on the Pacific highway. The tracks of the Milwaukee Railroad Company cross that highway from east to west two or three miles north of Tenino, in Thurston county. The paved portion of the highway is twenty feet wide. The shoulder, or dirt and gravel portion of the highway, on the west side of the paving at a point three hundred feet north of the railroad crossing, is four feet wide. The shoulder gradually increases in width until it is six feet wide at the place of the acci-

dent and six feet wide at the crossing. At the west edge of the shoulder, which is almost level with the pavement, is a ditch six or seven feet in depth. When about two hundred feet north of the railroad crossing, the two right wheels of the stage were driven off the paved portion of the highway on to the shoulder, and the stage proceeded to slow down to stop at the crossing, as required by the statute:

"Drivers of all motor vehicles carrying passengers for hire on any of the public highways of this state outside of the incorporated limits of any city or town, shall bring such vehicles to a full stop within fifty feet of any unguarded grade crossing of any railroad, or interurban track before crossing the same. . . ." Rem. Comp. Stat., § 6350.

The stage had traveled about one hundred feet with the two right wheels off the pavement when a southbound Dodge sedan, operated by a lady, drove alongside the stage. The evidence as to what occurred is in sharp conflict. The testimony in behalf of the appellants is that, two or three miles north of the railroad crossing, the stage, on its second or third effort, overtook and passed the Dodge sedan, which angered the lady driver. The sedan drove alongside the stage one hundred feet north of the crossing, the former coming into contact with the side of the stage, whereupon the stage swerved a little to the right towards the bank or shoulder to avoid a collision. The sedan pulled slightly to the left. The stage was then driven to the left back on to the pavement. Immediately following this move, the lady drove her sedan directly in front of the stage, striking the front left wheel of the stage. The collision turned the stage towards the bank, caused the driver to lose control of the stage, which was driven into the ditch, resulting in injuries to the respondent. The sedan continued on its course

for a distance of approximately forty feet, colliding with a semaphore four or five feet west of the highway and nine feet north of the railroad crossing. The lady driver, when rebuked for what she had done, said: "My intention was to run you down and bawl you out."

However, the verdict reflects acceptance by the triers of fact of the theory of respondent, which is supported by substantial evidence, to the effect that the sedan drove alongside the stage about one hundred feet north of the crossing. The lady driver of the sedan and the stage driver immediately engaged in conversation. The stage driver continued to converse with and look at the lady, paying no attention to the operation of the stage, which ran over the embankment into the ditch approximately forty feet south of the point where the sedan overtook the stage. Two hundred feet north of the railroad crossing, which is one hundred feet north of the point where the sedan ran alongside the stage, the right wheels of the stage were driven on the dirt portion or shoulder of the highway. The wheel prints indicated that the stage gradually proceeded farther and farther from the pavement until fifty or sixty feet north of the crossing, where it went over the bank into the ditch, having traveled one hundred and fifty feet with the two right wheels on the shoulder of the highway.

Appellants first complain that the court erred in sustaining an objection to the following question, asked on cross-examination of one of the respondent's physician witnesses: "Do you know what 'railway spine' is, doctor?" Under the general rule requiring a party offering evidence, when objection to its admission is made, to state its connection with other facts in order that its relevancy may be shown to the court, appellants' counsel stated:

"The purpose of my question is to show that complaints of this kind are often known as 'railway spine' and the patient after litigation is over summarily recovers. . . . That is as far as I intend to go.''

In support of the pertinency and propriety of such line of questioning, it is argued that respondent's contention, and the contentions of his physicians, that he was nervous and had pains in his back and spine, identify his ailment or injury as nervous affection recognized and designated by medical authority as "railway spine." In appellants' brief is the following quotation from Ashhurst on Surgery, Its Principles and Practice, p. 594:

"This term has been used to define a condition supposed to be more or less analogous to concussion of the brain (p. 569). It implies that there has been injury to the spinal cord without lesion of the vertebral column; and while some hold that the symptoms which follow a supposed injury have no pathological basis for their existence, being merely one form of neurosis, other authorities believe that actual changes in the cord have taken place, and have left more or less irreparable damage. Many of these patients receive their injury in railroad accidents, and the condition which ensues is popularly known as 'Railway Spine,' or, because of the improvement which usually follows the settlement of a suit for damages, as 'Litigation Spine.' ''

Counsel for appellants argue that the appellants should have been permitted to elicit from their physicians that such nervous affections as respondent claimed to have are known as "railway spine," an illness or condition from which the patient promptly recovers upon the conclusion of the litigation. It is insisted there is no intention of charging, nor do they endeavor to raise, the inference that

". . . the patient is faking, but that as a matter of fact when the mind gets off of the litigation and off

of the trouble, the pain disappears, and it was to develop that idea that counsel for appellants asked the question.''

Had appellants endeavored to prove that respondent was feigning the injury complained of, or that the injury was imaginary, a different question would be presented. There is no assignment that the trial court erred in not permitting appellants to ascertain by direct examination or by cross-examination whether respondent was feigning or imagining an injury. No question is presented as to whether a medical expert may testify on direct or cross-examination whether an injury complained of is feigned or imaginary. Appellants did not, in the court below, and do not here, argue that respondent is shamming—they expressly disclaim making any such charge—nor did they in the trial court and they do not in this court claim that respondent's injuries are imaginary.

''The inquiry on cross-examination should be allowed as wide a range as may be reasonably necessary to test the skill and reliability of the witness. The extent to which the examination may go in respect to such collateral matters rests in the sound discretion of the court, and the exercise of such discretion will not be reviewed on appeal, unless abused. . . .'' Jones Commentaries on Evidence (2d ed.), § 1342.

We said in *Levine v. Barry,* 114 Wash. 623, 195 Pac. 1003, that

''The expert witness, because of his superior knowledge of the subject about which he is testifying, may be a very useful or a very misleading, or even dangerous, witness, and as to him the rules of cross-examination should be liberalized rather than restricted,''

having in mind the general rule that on the cross-examination of an expert witness:

''The cross-examiner may rightfully propound hypothetical questions based entirely on conjectural facts

*for the purpose of testing the skill and knowledge of: the witness, . . . ''* (Italics ours.)

The cross-examiner in the case at bar had no such objective. The door to any legitimate subject of inquiry must not be closed and cross-examination is proper to test the knowledge and credibility of the witness, but it cannot be extended so as to get before the jury incompetent and prejudicial facts not referred to in the direct examination. We are in harmony with the rule that permits a wide latitude in the cross-examination of witnesses who have testified as experts, but, as said in Wigmore on Evidence (2d ed.), § 878: ''Cross-examination is no universal solvent for reducing everything to admissibility.'' It does not appear that the exclusion of the question (the witness answered that he knew what the term ''railway spine'' meant) resulted in any injustice to the appellants. Appellants do not complain of refusal of the trial court to permit them, at any stage of the trial, to offer evidence that the injuries of the respondent were feigned or imagined. The physician witnesses of appellants were later permitted to testify fully and in detail as to the injuries of the respondent.

While it is the general rule that a wide latitude is permitted in the cross-examination of a witness, particularly of a medical expert, the converse of that rule is that the trial court has a large discretion in the matter of denying or allowing the adduction of evidence on cross-examination. Under the facts of the case at bar, it is clear that the trial court did not improperly exercise that privilege.

■ The overruling of appellants' motion for judgment notwithstanding the verdict is next assigned as error. The facts of the case are recited above, and disclose that the testimony was conflicting and presented a question of fact for the jury as to the procur-

ing cause of the accident. The rule is well settled that the court can grant judgment notwithstanding the verdict only in those cases where there is neither evidence nor reasonable inference from evidence to justify the verdict.

"A motion for judgment notwithstanding the verdict involves no element of judicial discretion. It can only be granted when the court can say as a matter of law that there is neither evidence, nor reasonable inference from evidence, to sustain the verdict." *Karr v. Mahaffay,* 140 Wash. 236, 248 Pac. 801.

■ Appellants assign as error the giving of the following instruction:

"I instruct you that if you find the facts in this case to be that the driver of the stage, at the time and place of the accident, was slowing down preparatory to making a stop for the railroad crossing, on his side of the highway, and while so doing, the driver of another automobile wilfully, or otherwise, ran her automobile into and against the stage in which the plaintiff was riding, and because thereof said stage was forced off the highway and upset and caused the accident in question, then I instruct you that it is your duty to return a verdict for the defendants, and each of them. Provided, you find from the evidence that the driver of the stage exercised a reasonably high degree of care to prevent his stage from being forced off the highway *and could not thereby prevent the stage from being forced off the highway and down the embankment."*

Appellants argue that the italicized portion of the instruction is susceptible of the construction that, if the stage driver permitted, in any event, the stage to be forced off of the highway, then the appellants were liable; and that there was no evidence that the driver of the stage did not exercise all possible care to prevent the stage from being forced off of the highway.

The respondent testified as follows:

"A. I would say fifty or sixty feet back from where we went over the embankment, my attention directed to look forward for some reason, and I noticed a car along the side of the bus. I don't know what kind of a car, and I don't know who was driving it. However, the driver was looking out the window at this car. Q. Now, as you approached the scene of the accident, did the driver, at any time, put on his brakes or do anything other than what he was doing prior to the time that you noticed this automobile along the side of him? A. No. Q. About how far did the automobile drive along the side of the bus before the bus went over? A. I noticed it about fifty or sixty feet before it went over. I didn't look away. I was watching to see what was taking place. I noticed the driver looking out of the window at this car, not noticing where he was going, and it went over the bank while I was looking. Q. It went over the bank while you were looking, possibly fifty or sixty feet, you noticed them? What was the driver looking at at the time you went over the bank? A. Looking at the car at the side of the bus."

The stage driver testified:

"Q. About ten miles an hour when she first struck you; did you try to stop your car at that time? A. I put on the brakes, and when she started to pull away from me I continued on my way to make my regular stop. . . . after she started to pull away from me, I started to release the emergency brake and started to make my regular stop. Q. What distance could you have stopped the car at that time? A. Probably about five or six or seven feet. Q. . . . and going only ten miles an hour with good brakes the space that you could have stopped in was five or six or seven feet, and if you had done that the bus would not have overturned? A. The first time she hit me if I had stopped I wouldn't have gone into the ditch. Probably she would have cut in ahead of me sooner if I had stopped."

A common carrier by auto stage owes to its passengers the same degree of care as is required of any other common carrier. Such carrier owes to the passenger

for hire the duty of exercising the highest degree of care for his safety. The "highest degree" of care is a relative term. Upon appellants was imposed the duty of exercising the highest degree of care proportionate to the situation, and if the driver could, by the exercise of that degree of care required, have stopped the stage and avoided the wreck, and did not do so, the jury was warranted in finding the appellants guilty of negligence.

The driver will be presumed to have seen whatever he should have seen if properly performing his duties. There was evidence that the stage driver, from the time the sedan drove alongside the stage, continued on his course, gradually drawing nearer and nearer to the ditch. During that time, he was looking to the left and conversing with the sedan driver, heedless of the danger. That he could have stopped in time to prevent the accident, he so testified.

"Thoughtless inattention has been declared by this court to be the 'essence of negligence.'" *Towle v. Morse,* 103 Me. 250, 68 Atl. 1044.

"It is the duty of the driver of an automobile to keep a lookout in the direction in which he is going and turning, and to keep a vigilant watch ahead for other vehicles, and on the first appearance of danger to take proper steps to avert it, and to proceed carefully and be on the alert not to collide with others on the road *and the fact that the defendant was immediately before the accident looking to one side at property he was passing is evidence of negligence.*" (Italics ours.) Babbitt, Motor Vehicles (3d ed.), p. 827, § 1301.

The jury were not told that, as a matter of law, the only course open to appellants, if forced off of the traveled portion of the highway, was to stop, if the stage driver could safely do so. They were told that respondent was not entitled to recover if the stage was forced off of the highway by the sedan; and the proviso

does no more than direct the jury to determine whether, under the circumstances, a reasonably high degree of care was exercised by the stage driver to prevent being forced off the highway and down the embankment. The instruction as a whole may not be construed that, in any event, if the stage were forced off of the highway, the appellants were liable.

Appellants also object to the giving of the following instructions:

"I charge you that it was the duty of the driver of the stage in question to come to a full stop before crossing the railroad track in question, and likewise his duty, in so doing, to keep such vehicle as close as practicable to the right-hand boundary of such highway, in order to allow more swiftly moving vehicles reasonably free passage to the left.

"The statute further provides that it shall be unlawful to operate or drive any vehicle or combination of vehicles over or along any pavement or gravel or crushed rock surface on a public highway with one wheel or all the wheels off of the pavement or gravel or crushed rock surface except for the purpose of stopping off the pavement or gravel or crushed rock surface.

"You are instructed that if you find from the evidence that the driver of the bus drove one or more of the wheels of the bus off of the *paved portion* of said highway and not for the purpose of stopping said bus off of the paved surface, that would be negligence as a matter of law, and if by so doing that was the proximate cause of the accident in question and you find that the plaintiff was injured in manner as alleged in his complaint because thereof, then the plaintiff would be entitled to recover, unless you believe from the evidence that the driver of the bus was forced off of the paved portion of the highway."

Appellants insist that the highway surface consisted of part pavement and part gravel, and that, at the place of the accident, the gravel shoulder was about

five feet wide and was a portion of the highway constructed and maintained for use of vehicles; therefore, it was not negligence to drive upon any portion of the prepared surface of the highway, whether the prepared surface is all pavement or all gravel, or part pavement and part gravel. It is further urged that there was no evidence that the stage drove off of the graveled surface; that the respondent having pleaded as one of the acts of negligence that appellants carelessly, negligently and unlawfully caused the stage to be driven off of the paved portion of the highway on to the shoulder or embankment, the jury was justified, under the foregoing instructions, in believing that the simple fact that the right wheels of the stage were operated on that portion of the highway which was gravel was negligence as a matter of law.

The statute,

"It shall be unlawful to operate or drive any vehicle or combination of vehicles over or along any pavement or gravel or crushed rock surface on a public highway with one wheel or all of the wheels off of the pavement or gravel or crushed rock surface except for the purpose of stopping off the pavement or gravel or crushed rock surface" (Rem. 1927 Sup., § 6362-41, subd. 8) is clear. It means no more than that the portion of the highway allotted for vehicular use shall not be departed from except for stopping. In constructing the highway, the pavement was made twenty feet wide in order to adequately provide for traffic and to obviate the necessity of vehicles, in passing each other, to depart from the paved portion of the highway. Being of ample width to accommodate the vehicles, and the statute forbidding the driving with one or all of the wheels of a vehicle off of that part of the highway, it follows that, unless forced by the sedan to so drive, such driving was negligence; and if it was the proximate cause of the accident, the respondent was entitled to recover.

Judge Tolman, speaking for the court, in *Barach v. Island Empire Tel. & Tel. Co.*, 151 Wash. 279, 275 Pac. 713, stated the trial court erred in instructing the jury

". . . that the improved portion of the highway which lies adjacent to the edge of the pavement, the shoulder of the highway, as it is called, is as much a part of the highway as is the pavement itself,"

and, in criticizing the instruction, said:

"A pavement, sixteen or eighteen feet wide, is clearly intended as sufficient for vehicular traffic under ordinary conditions, and the exceptions set forth in the statute are intended to take care of those conditions which are out of the ordinary. The legislature has the power and the right to confine ordinary traffic to the paved portion of the highway, and having done so . . . A driver violating this statutory provision, should be placed under the burden of showing that his act in driving off of the pavement, for other than the purposes specified in the statute, was justifiable or necessary."

Conceding, *arguendo,* that the stage driver could lawfully use any portion of the highway, the left side of the traveled way and the graveled portion of the shoulder as well as the pavement, the rule is that, when he violates the law of the road, he must exercise a higher degree of care than otherwise, and if injury results from his failure to observe the statute, that failure will constitute negligence *per se.* However, the evidence shows that the right wheels of the stage were on the *dirt* portion of the shoulder two hundred feet from the railroad crossing and that the stage continued thereon until the accident.

"Q. You did, however, notice the wheels of the bus on the dirt portion of the highway? Now, in what direction did those tracks go? A. They left in a straight line, and as they left the pavement, gradually kept getting farther off the pavement until they went off the shoulder."

Considered as a whole, the instructions are not misleading. They correctly informed the jury that driving on the unpaved portion or shoulder of the highway, when not forced to do so, is negligence as a matter of law, but that respondent was not entitled to recover unless the jury believed from the evidence that the stage was not forced off the paved portion by the sedan, and that such departing from the pavement was the proximate cause of the accident.

■ The next instruction criticized recites:

"In this connection, however, you are instructed that it was the duty of the driver to exercise the highest degree of care for the safety of the passengers of the bus for the driver to keep the stage on the paved portion of the highway, if by the exercise of such high degree of care he could have prevented the stage running off the highway and being overturned."

This is objected to on the ground that, under it, the jury was justified in believing that the appellants were guilty of negligence if, at any time, the driver of the stage drove the wheels of the stage off of the paved portion of the highway on to the graveled portion of the shoulder of the embankment. The wheels of the stage were driven on the dirt portion of the shoulder two hundred feet from the crossing in violation of the law of the road, and for the reasons given in the discussion of the preceding instructions the objection is not well founded.

■ The appellants also object to the instructions:

"The court instructs the jury that, if you believe from a fair preponderance of the evidence that the driver of the stage in question was negligent, and that the third person, whose Dodge sedan it is alleged ran into the stage of the defendant company, was negligent and the negligence of both the stage driver and the negligence of the driver of the Dodge sedan contributed to cause the accident in question and the plaintiff

in the case was a passenger on the stage, then and in that event the plaintiff would be entitled to recover.''

It is contended that the question of proximate cause is entirely overlooked. Relying upon *Ross v. Smith & Bloxom,* 107 Wash. 493, 182 Pac. 582, appellants insist that the jury should have been instructed that, if both the stage driver and sedan driver were negligent and the negligence of the stage driver was the cause but for which the injury would not have happened, then respondent would be entitled to recover.

We find no error in the instruction. It states the general rule that, where the concurrent negligence of two or more persons combined results in an injury to a third person, the third person may recover from either or all of them. *Jones v. Spokane, Portland & Seattle R. Co.,* 69 Wash. 12, 124 Pac. 142. The judgment in *Ross v. Smith & Bloxom, supra,* was reversed because the trial court refused to give the instruction requested. In the case at bar, no request was made for a more specific instruction.

''It is true that some of the instructions were general, but in the absence of a request for more specific instruction, there would be no error by reason of this fact.'' *Wills v. Armond,* 115 Wash. 73, 196 Pac. 649.

From our examination of all of the instructions given, which must be considered as a whole, we conclude that they cover the issues made by the pleadings and the evidence and contain a correct statement of the law as applicable to the facts presented upon the trial.

It is next contended that the verdict is excessive. The testimony of the physician witnesses was in sharp conflict. There was evidence that respondent was fifty-one years of age at the time of the trial. While a railroad employee in 1913, one foot was amputated as the result of an accident. Since that time, he

has been employed either as a railroad conductor or as a locomotive engineer, but not continuously. At the date of the injury of which he now complains, he was not employed, although a short time prior thereto he was working as a railroad conductor. His wages averaged from two to three hundred dollars monthly. His injuries were such that he was confined to the hospital for seven weeks, and during the trial he wore a body brace and was unable to bend his back, because of the injury to his spine. Respondent's physicians testified that it would be impossible for him to ever perform railroad duties.

"The court will not set aside the verdict merely because it may differ in opinion from the jury as to the proper award to be made. In actions of tort for personal injuries, there is no certain or definite rule by which the amount of the award can be measured. It is a matter peculiarly within the province of the jury to determine, and parties have the right to the judgment of the jury, not the court, upon the matter. Before the court may interfere, therefore, it must be found that the verdict is so far inadequate, or so grossly excessive, as to be without support in the evidence, or it must appear that the verdict was the result of some extrinsic consideration, such as bias, passion, prejudice, or the like." *Dorian v. Boone,* 152 Wash. 681, 279 Pac. 107.

The verdict was for six thousand dollars. We are unable to find aught indicating that it was the result of other than the deliberate judgment of the jury.

The other assignments of error have been considered and found to be without substantial merit.

The judgment is affirmed.

PARKER, HOLCOMB, FRENCH, and MAIN, JJ., concur.